IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

INEZ MARIA GARCIA, individually and
with DENNIS DIONICIO GARCIA, individually
and jointly as parents and next friends of
DEJA BONET GARCIA and NICOLAS
DIONICIO GARCIA, minors,

      Plaintiffs,

vs.                                                                   No. CIV 04-0498 RB/LCS

UNITED STATES OF AMERICA, UNITED STATES
AIR FORCE, JAMES G. ROCHE, Secretary of the
United States Air Force, CHENEGA MANAGEMENT, LLC,
NORTHEAST CONSTRUCTION COMPANY of Nevada,
and JOHN DOE, Contractor,

      Defendants.

Consolidated With:

DENNIS DIONICIO GARCIA as Personal
Representative of the Estate MARCELINO
GARCIA,

      Plaintiff,

vs.                                                                    No. CIV 04-0499 RB/LCS

UNITED STATES OF AMERICA, UNITED STATES
AIR FORCE, JAMES G. ROCHE, Secretary of the
United States Air Force, CHENEGA MANAGEMENT, LLC,
NORTHEAST CONSTRUCTION COMPANY of Nevada,
and JOHN DOE, Contractor,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** came before the Court on Defendant United States' Motion to Dismiss for

Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment (Doc. 48), filed

on March 4, 2005, and Plaintiffs' Rule 56(f) Affidavit (Doc. 51), filed on March 24, 2005. Jurisdiction arises under 28 U.S.C. § 1332 and 1346. Having reviewed the submissions of the parties and the relevant law, I find that this motion should be construed as a motion for summary judgment and that the motion should be granted.

**I. Background.**

Dennis Dionicio Garcia, Inez Marcia Garcia, and their children, Deja Bonet Garcia and Nicolas Dionicio Garcia, ("the Garcias") were housed at 2553A Valencia Loop ("2553A"), on Holloman Air Force Base ("HAFB") near Alamogordo, New Mexico. Northeast Construction Company ("Northeast") renovated 2553A before the Garcias moved in. In May 2001, Chenega Management, LLC ("Chenega") contracted to manage 2553A and other on-base family housing at HAFB. On May 26, 2001, Dennis Garcia's father, Marcelino Garcia, visited the Garcias. At that time, Marcelino Garcia was receiving peritoneal dialysis. On May 27, 2001, Marcelino Garcia died from septic shock at an Alamogordo hospital.

In their Consolidated Second Amended Complaint, the Garcias allege that, as a result of faulty construction work, water penetrated their residence and toxic mold began to grow. Exposure to the toxic mold sickened the Garcias and Marcelino Garcia. The Garcias investigated the cause of their illnesses and discovered the toxic mold. The Garcias reported the presence of the mold to the Air Force and Chenega. The Air Force and Chenega tried to address the harm and remove the mold, but they did not properly remove the mold. The Garcias submitted administrative claims to the government, which were denied. They assert negligence and negligent supervision and retention

against the United States[1] under the Federal Tort Claims Act ("FTCA"), and negligence against Northeast and Chenega under state law.

In the IPTR, the Garcias contend that the Air Force violated specific, mandatory requirements to prevent mold intrusion because it failed to inspect 2553A during renovations and, thereafter, failed to warn them of the dangerous condition caused by the mold, and failed to contain and eradicate the mold. In their response brief, the Garcias argue that the government contracted with Northeast to convert 2553A from a flat roof to a pitch roof. They claim that Northeast built a faulty roof which leaked water onto the old flat roof, causing mold infiltration.

The government has filed a motion to dismiss, or for summary judgment, on the ground that any acts or omissions of government employees are exempt from liability under the discretionary function exception to the FTCA.

**II.     Facts.**

On June 21, 1993, the Air Force contracted with Northeast to renovate approximately 113 on-base family housing units at HAFB, including 2553A, in Phase I of a three-phase project. (Def. Exs. 5 and 6.) Although the government has been unable to locate the contract relating to Phase I, it has submitted the contract for Phases II and III. (Def. Ex. 8-9.) The Phase II and III contract involved the same renovations of on-base housing at HAFB as those covered in the Phase I contract. (Def. Ex. 6.) The renovation included demolition of the interior of the units, and installation of all new plumbing systems, electrical systems, sheetrock, floor tile, bathroom fixtures, kitchen cabinets,

---

[1] The United States is the only proper defendant in a suit brought pursuant to the Federal Tort Claims Act ("FTCA"). 28 U.S.C. §§ 1346(b)(1); 2679.

appliances, ductwork, and new roofs.  (Def. Ex. 6.)  Insulation was installed in 2553A by Northeast subcontractor on October 18, 1995.  (Def. Ex. 27.)

In February 1996, after renovations were completed, Northeast returned control of 2553A to the Air Force.  (Def. Ex. 6.)  On February 6, 1996, Dennis Garcia signed off on an inspection form for 2553A.  (Def. Ex. 13.)  The form noted minor cosmetic defects, but no indication of mold or water leaks.  (*Id.*)  On February 16, 1996, the Garcias moved in to 2553A.  (Def. Exs. 3, 11, 12.)

From that time until April 2001, the 49th Civil Engineering Squadron at HAFB was responsible for maintenance and management of 2553A.  (Def. Exs. 14; 29.)  In May 2001, the Air Force contracted with Chenega to maintain 2553A and other on-base family housing units at HAFB.  (Def. Ex. 15.)

On September 6, 2001, the Garcias reported a water leak in the ceiling.  (Def. Ex. 16; Pl. Ex. F.)  Chenega noted that the leak might be caused by a leaking swamp cooler.  (*Id.*)  The work order indicates that Chenega completed work on the problem on September 10, 2001.  (Pl. Ex. F.)  On October 15, 2001, the Garcias reported a spongy, discolored area on a wall.  (*Id.*)  Chenega completed work on the wall problem on November 26, 2001.  (*Id.*)

On November 30, 2001, the Garcias reported that sheetrock had fallen over the water heater. (Pl. Ex. F.)  This problem was addressed by December 3, 2001.  (*Id.*)  On May 8, 2002, the Garcias reported mildew on a bedroom wall. (Def. Ex. 16; Pl. Ex. F.)  Chenega re-grouted and re-caulked a shower.  (*Id.*)  On May 24, 2002, the Garcias reported that the dishwasher was spraying water all over the kitchen.  (Def. Ex. 16.)  Chenega fixed the dishwasher. (*Id.*)

On July 31, 2002, the Garcias asked Chenega to evaluate mold.  (Def. Ex. 17; Pl. Ex. F.) From August 4-19, 2002, the Air Force housed the Garcias in a hotel.  (Def. Ex. 18.)  On August 23,

2002, the Garcias moved out of 2553A into off-base housing. (Def. Ex. 20.)

On August 23, 2002, SafeNet Environmental Services prepared a mold identification report. (Def. Ex. 19.) SafeNet found visible fungal growth on the bathroom shower stall, on a wall in Deja Garcia's bedroom, and in the kitchen behind the dishwasher. (*Id.*) Analysis of samples revealed several genera of mold commonly identified as possible allergens. (*Id.*) The samples from Deja Garcia's bedroom and behind the dishwasher contained fruiting structures of Stachybotrys mold and "loaded" concentrations of spores, indicating active fungal growth. (*Id.*) The swab from the shower indicated a "moderate" concentration of spores. (*Id.*) The spore concentrations on other samples were rated at "rare" or "few." (*Id.*) According to the SafeNet report, "rare" and "few" are within acceptable exposure standards, provided the occupants do not have a specific reaction to a particular genera of mold. (*Id.*) SafeNet recommended investigation and repair of the causes of the moisture leaks promoting the fungal growth and removal and replacement of the contaminated areas and recommended ambient air sampling. (*Id.*)

On November 21, 2002, the Clayton Group conducted a mold assessment on 2553A. (Pl. Ex. B.) The assessment found fungal growth in the master bedroom and master bathroom; elevated moisture levels in all three bedrooms, the master bath, the kitchen, and the family room; and evidence of water damage in the space between the roof and the ceiling under the evaporative cooler. (*Id.*) In an executive summary of the report, Lt. Col. Gordon C. Peters observed that the fungal magnification found in the house was not surprising because fungal growth was visibly apparent. (*Id.*) Lt. Col. Peters further noted that air samples from the house and dust samples from the Garcias' furniture cushions did not exceed OSHA standards and did not indicate high levels of Stachybotrys, or "toxic mold." (*Id.*) Specimens taken throughout the residence did not show high levels of

5

Stachybotrys. (*Id.*)

According to Maj. Richard J. Bert, Jr., Chief of Bioenvironmental Engineering at HAFB, from 1996-2001, there were no Air Force Directives, Instructions or Standards requiring the Air Force to perform inspections or investigations for mold in base housing. (Def. Ex. 21.) In addition, the Air Force had no standards regarding indoor air quality ("IAQ") and mold. (*Id.*) Major Bert acknowledged that a technical report, AL-TR-1992-0016, "Guide for Indoor Air Quality Surveys," dated May 1992, provided guidance for performing IAQ surveys for bioaerosols, including mold. (*Id.*) However, the report states that there were no standards for regulating microorganisms in the environment. (*Id.*)

Major Bert stated that, in the absence of Air Force Directives, Instructions, or Standards regarding IAQ and mold, the Air Force uses guidance from the Environmental Protection Agency ("EPA") and the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE"). (Def. Ex. 21.) In March 2001, the EPA published guidance on addressing mold discovered in schools and commercial buildings, but the publication did not impose standards for routine inspections for mold. (*Id.*) During the relevant period, the EPA had not published any guidance relating to inspecting for mold in family housing. (*Id.*) In 1989, ASHRAE published guidance on proper ventilation, temperature, and relative humidity on heating, ventilation, and air conditioning ("HVAC") systems, but did not indicate a need for routine inspections for mold. (*Id.*)

The Air Force has issued policies concerning on-base family housing. Air Force Instruction ("AFI") 32-6001, dated April 26, 1994, contains guidance for establishing family housing management programs at Air Force installations. (Def. Ex. 22.) AFI 32-6001 assigns to occupants the responsibility for routine maintenance, minor repair, operation, housekeeping, and reporting of

6

maintenance needs.  (*Id.*)  Maintenance contractors or civil engineering shops are assigned the duty of day-to-day maintenance.  (*Id.*)  AFI 32-6002, dated May 12, 1994, implements laws, incorporates Department of Defense and Air Force policies, outlines procedures, and prescribes documents for identifying real property facility requirements for family housing. (Def. Ex. 26.)

Air Force Policy Directive ("AFPD") 32-60, dated July 20, 1994, states that the Air Force is committed to adequately house its people and responsibly manage its housing resources.  (Def. Ex. 23.)  AFPD 32-60 explains that, "within established limits," the Air Force "will operate and maintain cost-effective housing in good condition to reduce operating expenses and to protect the facilities from deterioration." (*Id.*)

Air Force Handbook ("AFH") 32-6009, dated June 1, 1996, supplements AFI 32-6001 and AFPD 32-60, covers the management and operation of family housing. (Def. Ex. 24.)  HAFB Family Housing Brochure, dated May 1995, covers specific considerations for families living at HAFB, including the risk of asbestos exposure and childhood lead poisoning. (Def. Ex. 25.)  None of these documents require indoor mold inspections.

**III.    Standard.**

The applicability of an exception to the FTCA's waiver of immunity presents a jurisdictional issue. *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998).  Rule 12(b)(1)of the Federal Rules of Civil Procedure allows dismissal of a complaint for "lack of jurisdiction over the subject matter." FED. R. CIV. P. 12(b)(1).  When a party challenges the allegations supporting subject matter jurisdiction, the court has wide discretion to allow affidavits and other documents to resolve disputed jurisdictional facts. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir.

1995); *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). In such a case, reference to evidence outside the pleadings does not necessarily convert the motion to a summary judgment motion under FED. R. CIV. P. 56. *Holt*, 46 F.3d at 1003.

However, where jurisdictional issues raised in a Rule 12(b)(1) motion are intertwined with the merits of the case, the motion should be resolved under Rule 56. *Holt*, 46 F.3d at 1003. In analyzing whether jurisdiction is intertwined with the merits of a particular dispute, "the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Sizova v. Nat. Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002). The applicability of the FTCA's discretionary function exception is a jurisdictional question that is intertwined with the merits of the case. *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1129 (10th Cir. 1999). Therefore, the summary judgment standard will be applied.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id*.

**IV.     Rule 56(f) Affidavit.**

Mr. A. Brent Bailey, attorney for the Garcias, has submitted a Rule 56(f) affidavit. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

FED. R. CIV. P. 56(f).

Mr. Bailey states that the Garcias have been unable to present facts essential to justify their opposition to the government's motion for the following reasons: "A. Plaintiffs have not had an opportunity to discover the Defendant's safety and habitability policies for its on-base housing at HAFB; B. Plaintiffs have not had an opportunity to discover the reasons that Defendant has a policy for mold identification, surveillance, and remediation; and C. Plaintiffs cannot completely respond to Defendant's claim that its conduct was in all respects discretionary." (Aff. of A. Brent Bailey Pursuant to FED. R. CIV. P. 56(f).)  Mr. Bailey requests a continuance pursuant to Rule 56(f) to permit the Garcias to obtain affidavits, depositions and discovery to supplement the Garcias' response to the motion.

In order to obtain a continuance under Rule 56(f), a nonmovant must present an affidavit explaining why facts precluding summary judgment cannot be presented. *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992).  This includes identifying the probable facts not available and what steps have been taken to obtain these facts. *Id.* The nonmovant also must explain how additional time will enable him to rebut movant's allegations of no genuine issue of fact. *Id.*

Mr. Bailey's affidavit states that the Garcias have not had an opportunity to discover the Air Force safety and habitability policies for on-base housing at HAFB, and the reasons that the Air Force has a policy for mold identification, surveillance, and remediation.  However, the government attached the policies governing on-base housing at HAFB and an affidavit stating there were no Air

9

Force Directives, Instructions or Standards that required the Air Force to perform inspections for mold in on-base housing. (Def. Exs. 21-26.) Mr. Bailey does not specify what would be revealed by further discovery, nor does he explain how additional information would allow the Garcias to rebut the government's showing.

In *Miller v. United States*, 710 F.2d 656 (10th Cir. 1983), the Tenth Circuit upheld the district court's grant of summary judgment based on the discretionary function exception before the plaintiffs obtained any discovery. *Id.* at 667. In the instant case, unlike the *Miller* case, discovery has been underway for almost six months. In addition, the Garcias have access to the policies and government publications provided by the United States in support of its motion. The Garcias have failed to specify what they hope to discover that would change the nature and effect that the Air Force policies have in this action. Under these circumstances, the Garcias' request for a Rule 56(f) continuance is denied.

**V.     Discussion.**

The FTCA waives sovereign immunity for "the negligent or wrongful act or omission" of a federal employee "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The United States can be held liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Excluded from this broad waiver of immunity, however, are claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Accordingly, the exception can apply even if the government employee was negligent. *Aragon*, 146 F.3d at 822.

The discretionary function exception "marks the boundary between Congress' willingness to

impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). The exception imposes a "jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." *Aragon*, 146 F.3d at 823.

The Supreme Court has devised a two-part test to determine the applicability of the discretionary function exception. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The first prong of the *Berkovitz* test inquires whether a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. *Id.*, 486 U.S. at 536. In order to qualify as "prescribed," the course of action must be "specific and mandatory." *Aragon*, 146 F.3d at 823. If a federal statute, regulation, or policy imposes specific or mandatory directives, conduct pursuant to that directive is not discretionary since "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. However, if the course of action involves a matter of choice or judgment, then the action is discretionary, and the inquiry proceeds to the second prong of the *Berkovitz* test. *Id.*; *see also Elder v. United States*, 312 F.3d 1172, 1176 (10th Cir. 2002).

The second prong of the *Berkovitz* test inquires whether the exercise of judgment or choice at issue "is the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. Only governmental actions and decisions based on considerations of public policy are protected by the exception. *Id.*, 486 U.S. at 537. The goal of this inquiry is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.*, 486 U.S. at 536-37 (quoting *Varig Airlines*, 467 U.S. at 814). The subjective intent of the employee is irrelevant; the question is whether the nature of the actions implicate public policy concerns, or are susceptible to policy

11

analysis. *Lopez v. United States*, 376 F.3d 1055, 1057 (10th Cir. 2004) (quoting *United States v. Gaubert,* 499 U.S. 315, 325 (1991)).

With respect to the first prong of *Berkovitz*, the Garcias assert that the Air Force had policies governing roof slope conversion, roof inspection, testing IAQ, and mold containment, eradication and remediation.  In support of their response, the Garcias submitted AFI 32-1051, dated May 13, 1994. (Pl. Ex. A.)  This publication provides guidance for establishing and maintaining a roof management program and contains a statement in the banner that compliance with the publication is mandatory. (*Id.*)  The roof on 2553A was converted from a low slope roof to a pitch roof during the Northeast renovations.  (Def. Ex. 29.)  Although it is not a model of clarity, a fair reading of AFI 32-1051 indicates that it applies to low-slope roofs, and not pitch roofs.  For instance, the introduction refers to a Membrane Roofing Systems manual and the definitions section states that pitch roofs are monitored by the user, implying that the monitoring system suggested by AFI 32-1051 does not apply to pitch roofs.  Thus, the language of AFI 32-1051 implies that it does not apply to a pitch roof structure, such as 2553A.

In order to clarify the meaning of AFI 32-1051, the government submitted the affidavit of Lawrence E. Spangler, an architect and criteria manager with the Air Force Civil Engineer Support Agency ("AFCESA"), the Office of Primary Responsibility for AFI 32-1051. (Def. Ex. 28.)  Mr. Spangler explained that AFI 32-1051 applies to implementation of a management program for low-slope membrane roofing, not pitch roof structures.  (*Id*.)  AFI 32-1051 was not written for pitch roof structures and there is no corresponding AFI for pitch roof structures.  (*Id*.)  Moreover, AFI 32-1051 does not apply to family housing because family housing standards and programs are established by a different Air Force office.  (*Id*.)

Mr. Spangler stated that AFIs are required to contain a statement in the banner that

12

compliance is mandatory. (Def. Ex. 28.) However, typically, AFIs also include general guidance and other non-mandatory provisions. (*Id.*) Compliance with AFIs is not mandated because Base Civil Engineering organizations often do not have adequate resources, such as manpower and funding, for full implementation. (*Id.*) Carrol Helms, Chief of the Housing Flight at HAFB, affirmed that there were no Air Force Directive or AFIs requiring housing maintenance to inspect the roofs of family housing during the relevant period. (Def. Ex. 29.)

The Garcias moved to file a surreply because they believed that the Spangler and Helms declarations were deceptive. The Garcias asserted that "[c]ontrary to the declaration of Spangler and the argument of the USAF, Mr. Spangler's office has authored a specific, direct and detailed guideline for management of pitch roofs." (Mem. Br. in Support of Mot. to File Surreply.) The Garcias also asserted that compliance with all aspects of an AFI is mandatory. The motion to file surreply was granted. The Garcias filed a surreply elaborating on their arguments in their motion to file a surreply.

In support of their assertion that "Mr. Spangler's office has authored a specific, direct and detailed guideline for management of pitch roofs," the Garcias submitted an AFCESA Field Guide. (Pl. Ex. 1.) The field guide states that its purpose "is to provide a ready reference for establishing and conducting a roof management program for steep sloped roofing systems." (*Id.*) The publication does not contradict the Spangler and Helms declarations because the field guide is not an AFI or directive and the field guide does not contain specific instructions concerning inspections of on-base family housing. (*Id.*)

The Garcias charge of deception in connection with mandatory compliance with AFIs is similarly unfounded. The Garcias submitted AFI 33-360, dated January 30, 2004, as proof that Spangler was deceptive in stating that compliance with AFIs was not mandatory. (Pl. Ex. 2.) However, AFI 33-360 states that AFIs provide essential procedural guidance to implement Air Force

13

policy in the field. (*Id.*) This language indicates that AFIs are intended to provide guidance, and do not prescribe specific courses of conduct. AFI 33-360 is not inconsistent with the declarations of Spangler and Helms.

In order to meet the first prong of *Berkowitz*, the Garcias must demonstrate that the government's actions "involved no element of choice." *Elder*, 312 F.3d at 1177. The language of AFI 32-1051 invokes the exercise of judgment because it is intended to provide guidance on establishing and maintaining a roof management program. Such statements establish that the AFI 32-1051 was intended to provide guidance to the agency and is not entitled to the force and effect of law. *See Aragon*, 146 F.3d at 824-825. AFI 32-1051 does not support the Garcias position because it does not eliminate all elements of judgment and discretion from the Air Force in establishing and maintaining a roof management program.

In addition to AFI 32-1051, the Garcias rely on four other documents to meet the first prong of the *Berkowitz* test. The Garcias submitted portions of a Guide for Indoor Air Quality Surveys, AL-TR 1992-0016, dated May 1992, issued by the Air Force Occupational and Environmental Health Directorate. (Pl. Ex. C.) The portions of this Guide, submitted by the Garcias, reviewed studies of mold sources in the work place, described survey steps for buildings with occupant health complaints, and provided IAQ troubleshooting guidelines. (*Id.*) The Guide is not helpful to the Garcias because it does not prescribe a specific course of action.

The Garcias also attached EPA specifications for testing IAQ at an EPA facility, (Pl. Ex. D), Engineering Technical Letter (ETL) 97-13: Dormitory Ventilation and Exhaust System Design Criteria, issued by AFCESA, (Pl. Ex. E), and a fact sheet issued by the Air Force containing general facts and information regarding molds and IAQ. (Pl. Ex. E.) The fact sheet recognizes that there are no specific guidelines or regulations for molds and affirmatively states that there is a lack of standards

or regulations on the subject.

None of the documents constitutes a specific and mandatory requirement as the Tenth Circuit defines that term. *Franklin Savings*, 180 F.3d at 1132. Instead, they all state general goals, or sets of objectives to balance in precatory language. *Id*. The publications contain discretionary language "that gives federal agencies a choice or judgment on what action to take, *if any*." *Aragon*, 146 F.3d at 824 (emphasis supplied). The materials relied on by the Garcias delegate extensive discretion to the Air Force in managing base facilities. Because no statute, regulation, or policy specifically prescribed a course of action for the Air Force to follow, the challenged conduct was discretionary under the first prong of the *Berkovitz* test.

The second prong of the *Berkovitz* test requires a determination as to whether the challenged conduct is "susceptible to policy analysis." *Gaubert*, 499 U.S. at 323; *Berkovitz*, 486 U.S. at 537. The pertinent inquiry is whether the decision "implicates the exercise of a policy judgment of a social, economic, or political nature." *United States v. Duke*, 131 F.3d 1407, 1411 (10th Cir. 1997). When established governmental policy allows a government agent to exercise discretion, it is presumed that the agent's actions are grounded in policy when exercising that discretion. *Gaubert*, 499 U.S. at 324.

The Garcias rely on *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005). In *Whisnant*, the Ninth Circuit held that the second prong of *Berkowitz* did not bar a claim that the government was negligent in following through on safety procedures to safe guard the health of its employees and customers from a mold infestation at a Navy commissary. *Whisnant*, 400 F.3d at 1183. The Ninth Circuit drew on two themes in that circuit's jurisprudence: (1) the trend of distinguishing between design and implementation; and (2) the concept that matters of scientific and professional judgment--particularly judgments concerning safety--are rarely considered to be susceptible to social, economic, or political policy. *Whisnant*, 400 F.3d at 1183. A review of Tenth Circuit authority

reveals that the Tenth Circuit has not, and would not, subscribe to the Ninth Circuit's views. *See Lopez*, 376 F.3d at 1060 (observing no clear distinctions between types of government action in discretionary function area); *Elder*, 312 F.3d at 1181-82 (holding that agency may weigh cost of safety measures against other policy considerations); *Aragon*, 146 F.3d at 826-27 (recognizing that Air Force may place military concerns above any other considerations). *Whisnant* is not controlling in the circuit. Furthermore, I find that *Whisnant* is not persuasive because it is inconsistent with Tenth Circuit jurisprudence.

*Aragon* is particularly instructive. In that case, the plaintiffs, landowners who lived near the former Walker Air Force Base in Roswell, New Mexico, claimed that Air Force operations generated TCE contamination which polluted their residential water wells. *Aragon*, 146 F.3d at 822. In affirming dismissal of the landowners' pollution claims, the Tenth Circuit concluded that the FTCA discretionary function exception applied. *Aragon*, 146 F.3d at 822. With respect to the second prong of *Berkowitz*, the analysis focused not on the policies surrounding groundwater protection, but on the "broader policies affecting airbase operations." *Aragon*, 146 F.3d at 826. The Tenth Circuit had "little doubt" that the decisions surrounding the operation of an airbase "involve policy choices of the most basic kind." *Id.* Based on this reasoning, I conclude that management of on-base family housing at HAFB is susceptible to policy analysis. The second prong of the *Berkowitz* test has been satisfied and the government is entitled to the protection of the discretionary function exception.

The government argues that it is not liable for its selection of independent contractors or the acts of the independent contractors. In their response brief, the Garcias clarify that their claims against the government are for acts and omissions occurring in the relationship between the Garcias and the government, and not for the alleged negligence of Northeast and Chenega. However, the Garcias observe that the government has been unable to locate the contract with Northeast for

renovation of 2553A. The Garcias speculate that the contract may have specified safety duties and placed supervisory responsibility on the government.

The government has located and produced its contract with Northeast for the Phase II and III renovations of on-base family housing at HAFB. (Def. Ex. 6, 9.) The contract for Phase II and III places no specified safety duties or supervisory responsibility on the government. (Def. Ex. 9.) The Garcias have offered no factual basis that indicates the contract for Phase I differed from the contract for Phases II and III in any material respect. Under these circumstances, I conclude that the government's actions with respect to its appraisal and inspection of the work of Northeast and Chenega were based on considerations of public policy. *See Domme v. United States*, 61 F.3d 787, 792 (10th Cir. 1995). The claims against the government are barred by the discretionary function exception.

**WHEREFORE,**

**IT IS ORDERED** that Plaintiffs' request for a Rule 56(f) continuance is denied.

**IT IS FURTHER ORDERED** that Defendant United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment (Doc. 48), filed on March 4, 2005, construed as a motion for summary judgment, is **GRANTED.**

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**