IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**INEZ MARIA GARCIA, individually and
with DENNIS DIONICIO GARCIA, individually
and jointly as parents and next friends of
DEJA BONET GARCIA and NICOLAS
DIONICIO GARCIA, minors,**

      **Plaintiffs,**

vs.                                                                                                          No. CIV 04-0498 RB/LCS

**UNITED STATES OF AMERICA, UNITED STATES
AIR FORCE, JAMES G. ROCHE, Secretary of the
United States Air Force, CHENEGA MANAGEMENT, LLC,
NORTHEAST CONSTRUCTION COMPANY of Nevada,
and JOHN DOE, Contractor,**

      **Defendants.**

**Consolidated With:**

**DENNIS DIONICIO GARCIA as Personal
Representative of the Estate of MARCELINO
GARCIA,**

      **Plaintiff,**

vs.                                                                                                          No. CIV 04-0499 RB/LCS

**UNITED STATES OF AMERICA, UNITED STATES
AIR FORCE, JAMES G. ROCHE, Secretary of the
United States Air Force, CHENEGA MANAGEMENT, LLC,
NORTHEAST CONSTRUCTION COMPANY of Nevada,
and JOHN DOE, Contractor,**

      **Defendants.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

      **THIS MATTER** came before the Court on Defendant United States' ("Government's")

Motion to Dismiss Plaintiffs' Rule 60 (b) Motion and Request for Extension of Time to Respond to

Plaintiffs' Motion (Doc. 105), filed on November 15, 2005, and Plaintiffs Dennis Garcia and Inez Garcia's ("the Garcias'") Motion for Relief from Judgment or Order (Doc. 100), filed on October 31, 2005. Jurisdiction is founded upon 28 U.S.C § 1331. Having reviewed the submissions of the parties and the relevant law, the Court finds that the Government's request for an extension of time to file a response brief should be granted nunc pro tunc, the Government's motion to dismiss the Garcias' motion should be denied as moot, and the Garcias' motion should be denied.

**I. Background.**

From February 1996 until August 2002, the United States Air Force assigned the Garcias and their two minor children to live in Unit 2553A ("2553A") on Holloman Air Force Base ("HAFB") near Alamogordo, New Mexico. Marcelino Garcia visited the Garcias in May 2001, and died on May 27, 2001. The Garcias allege that the Government, through faulty construction, negligent maintenance, and ineffective remediation, allowed toxic molds to incubate and grow in 2553A, and that exposure to the toxic molds caused them harm and damages.

The Garcias submitted administrative claims to the Government, which were denied. The Garcias brought suit, alleging negligence, negligent supervision, and negligent retention against the Government, the United States Air Force, and the Secretary of the United States Air Force[1] under the Federal Tort Claims Act, 28 U.S.C. §§ 1346; 2671, *et seq.*, ("FTCA"), as well as state-law negligence claims against Northeast Construction Company ("Northeast") and Chenega Management, LLC ("Chenega"). On January 9, 2006, the claims against Chenega were dismissed pursuant to a

---

[1] The Government is the only proper defendant in a suit brought pursuant to the FTCA. *See* 28 U.S.C. §§ 1346(b)(1); 2679.

settlement.

The Government filed a motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment, arguing that the claims against it were barred by the discretionary function exception to the FTCA. In a Memorandum Opinion and Order issued on June 30, 2005 ("MOO"), the Court construed the motion as a motion for summary judgment and determined that the discretionary function barred the claims against the Government.

The Garcias seek reconsideration of the MOO, pursuant to FED. R. CIV. P. 60(b)(2) and (3), arguing that the discretionary function exception is inapplicable to their claim that the Government was negligent in retaining and supervising Northeast.

**II. Standard.**

Both the Garcias and the Government argue the motion for reconsideration in terms of Rule 60(b). However, Rule 60(b) applies only to final orders or judgments. *Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003). The MOO adjudicated fewer than all the claims and fewer than all the rights and liabilities of the parties. Judgment was not issued on the MOO. No certification was issued pursuant to FED. R. CIV. P. 54(b). Thus, the MOO was a non-final order and Rule 60(b) is inapplicable.

Rule 54(b) provides: "any order . . . however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." FED. R. CIV. P. 54(b). A district court has discretion to revise a non-final ruling at any time prior to entry of the final judgment. *See Anderson v. Deere & Co.*, 852 F.2d 1244, 1246 (10th Cir. 1988).

As a matter of discretion, the Court finds it appropriate to revisit the question of the applicability of the discretionary function exception.

### III. Discussion.

#### A. Motion to Dismiss Plaintiffs' Rule 60 (b) Motion.

The Government moved to dismiss the Garcias' motion on the ground that the Garcias had filed a notice of appeal. In its memorandum brief in support of the motion to dismiss, the Government sought an extension of time to respond to the Garcias' motion. The Garcias responded that they anticipated dismissal of the appeal and that they did not oppose the Government's request for an extension of time.

On March 20, 2006, the Tenth Circuit summarily dismissed the Garcias' appeal because the appeal was from a non-final order. The Government filed its response to the Garcias' motion on January 4, 2006. The Court will grant the Government's request for extension of time nunc pro tunc to January 4, 2006, and deny the motion to dismiss as moot.

#### B. Motion for Relief from Judgment or Order (Doc.100), filed on October 31, 2005.

The Garcias argue that the discretionary function exception is inapplicable based on three documents that the Garcias obtained on September 7, 2005, through discovery from Northeast. The three documents are: (A) Contract No. F29651-93-C-00012 for Phase I[2] ("Phase I Contract"); (B) Stipulation of Settlement and Agreement ("Settlement Agreement"); and (C) Specifications for the Phase I Contract ("Specifications"). (Pl. Exs. A-C.)

---

[2] Although the Government was unable to locate the Phase I Contract for consideration in the MOO, it submitted the contract for Phases II and III of the project that involved renovations of on-base housing at HAFB similar to those covered in the Phase I Contract.

4

**i. Summary of Documents.**

The Government awarded the Phase I Contract to Northeast on May 7, 1993, in the amount of $3,853,725.00. (Pl. Ex. A.) The Phase I Contract covered the upgrade of 113 housing units on HAFB in accordance with plans and specifications. (*Id*.) The Specifications provided in pertinent part that installer was required to "examine the substrates and conditions under which insulation work is to be performed" and to install "[a]sphalt shingle roofing, with moisture shedding underlayment, eave, valley, and ridge protection, and associated protective flashings." (Pl. Ex. C.)

The Specifications directed the installer to "[c]oordinate installation of roof mounted components or work projecting through the roof," "[v]erify roof openings are framed, sized and located prior to installing work for this Section," and "[c]omplete installation to provide weather tight service." (*Id*.) The Specifications required the installer to weatherlap and seal joints with plastic cement. (*Id*.)

The Government and Northeast entered into the Settlement Agreement on December 15, 1995. (Pl. Ex. B.) The Settlement Agreement recited that the Government and Northeast had entered into the Phase I Contract and Contract No. F29651-92-C-049, and that Northeast had filed two appeals concerning the contracts with the Armed Services Board of Contract Appeals. (*Id*.) The appeals involved claims asserted by Northeast against the Government for costs associated with equitable adjustments for (1) installation of gutters and (2) increased costs related to a suspension of work on Phase I of the project for the period between July 21, 1993 and February 23, 1994. (*Id*.)

In addition to the two appeals, the Settlement Agreement resolved the following disputed issues with respect to the Phase I Contract: government furnished material; rebuilding of government toilets; installation of phone jacks; beam removal and replacement; repair of units under warranty;

extended performance; installation of kitchen shelves; front elevation gutter installation; installation and fitting of doors; repair of penetrations in mechanical rooms; and supply and installation of interior doors. (Pl. Ex. B.)

In the Settlement Agreement, the Government agreed to pay Northeast $1,742,500.00 and release Northeast from further work on the contracts after December 15, 1995. (Pl. Ex. B.) Northeast agreed to vacate HAFB and the Government agreed to perform all remaining work on all remaining housing units at government expense. (*Id.*) The Settlement Agreement provided that Northeast was not responsible for any warranty work in any housing unit not accepted by the Government by December 15, 1995. (*Id.*)

### ii. Factual Overview from MOO.

The MOO recited that insulation was installed in 2553A by a Northeast subcontractor on October 18, 1995. (Def. Ex. 27.) On February 6, 1996, Dennis Garcia signed off on an inspection form for 2553A. (Def. Ex. 13.) The form noted minor cosmetic defects, but no indication of mold or water leaks. (*Id.*) On February 16, 1996, the Garcias moved into 2553A. (Def. Exs. 3, 11, 12.)

From February 1996 until April 2001, the 49th Civil Engineering Squadron at HAFB was responsible for maintenance and management of 2553A. (Def. Exs. 14; 29.) In May 2001, the Air Force contracted with Chenega to maintain 2553A and other on-base family housing units at HAFB. (Def. Ex. 15.)

On September 6, 2001, the Garcias reported a water leak in the ceiling. (Def. Ex. 16; Pl. Ex. F.) Chenega noted that the leak might be caused by a leaking swamp cooler. (*Id.*) The work order indicates that Chenega completed work on the problem on September 10, 2001. (Pl. Ex. F.) On October 15, 2001, the Garcias reported a spongy, discolored area on a wall. (*Id.*) Chenega

6

completed work on the wall problem on November 26, 2001. (*Id*.)

On November 30, 2001, the Garcias reported that sheetrock had fallen over the water heater. (Pl. Ex. F.) This problem was addressed by December 3, 2001. (*Id*.) On May 8, 2002, the Garcias reported mildew on a bedroom wall. (Def. Ex. 16; Pl. Ex. F.) Chenega re-grouted and re-caulked a shower. (*Id*.) On May 24, 2002, the Garcias reported that the dishwasher was spraying water all over the kitchen. (Def. Ex. 16.) Chenega fixed the dishwasher. (*Id*.)

On July 31, 2002, the Garcias asked Chenega to evaluate mold. (Def. Ex. 17; Pl. Ex. F.) From August 4-19, 2002, the Air Force housed the Garcias in a hotel. (Def. Ex. 18.) On August 23, 2002, the Garcias moved out of 2553A into off-base housing. (Def. Ex. 20.)

### iii. Reconsideration of the Applicability of the Discretionary Function Exception.

The FTCA authorizes civil suits against the United States ". . . for money damages . . . for injury or loss of property, or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

The FTCA waiver of sovereign immunity is limited by the discretionary function exception, which prohibits any claim against the United States ". . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities

from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). The exception imposes a "jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998).

The Supreme Court has devised a two-part test to determine the applicability of the discretionary function exception. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The first prong of the *Berkovitz* test inquires whether a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. *Id.*, 486 U.S. at 536. In order to qualify as "prescribed," the course of action must be "specific and mandatory." *Aragon*, 146 F.3d at 823.

If a federal statute, regulation, or policy imposes specific or mandatory directives, conduct pursuant to that directive is not discretionary since "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. When such a statute or regulation is applicable, there is no discretion involved and the discretionary function exception does not apply. *Black Hills Aviation, Inc. v. United States*, 34 F.3d 968, 972-73 (10th Cir. 1994). However, if the course of action involves a matter of choice or judgment, then the action is discretionary, and the inquiry proceeds to the second prong of the *Berkovitz* test. *Berkovitz* 486 U.S. at 536; *see also Elder v. United States*, 312 F.3d 1172, 1176 (10th Cir. 2002).

The second prong of the *Berkovitz* test inquires whether the exercise of judgment or choice at issue "is the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. The Court clarified the second prong of *Berkovitz* in *United States v. Gaubert*, 499 U.S. 315, 325 (1991). The subjective intent of the government employee is irrelevant; the relevant consideration is whether the nature of the action implicates policy concerns or is susceptible to policy

8

analysis. *Id.*; *Lopez v. United States*, 376 F.3d 1055, 1057 (10th Cir. 2004). The goal of this inquiry is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.*, 486 U.S. at 536-37 (quoting *Varig Airlines*, 467 U.S. at 814).

As more fully discussed in the MOO, no statute, regulation or policy specifically prescribed a course of action for the Government to follow with respect to renovating Unit 2553A. However, contractual duties assumed by the Government may curtail discretion and render the exception inapplicable. *See Bell v. United States*, 127 F.3d 1226 (10th Cir. 1997). The Garcias argue that the Phase I Contract, the Specifications and the Settlement Agreement specifically prescribe a course of action for the Government to follow within the meaning of the first prong of *Berkovitz*.

In order to prevail on the first prong of *Berkovitz*, the Garcias must demonstrate that the challenged conduct involved "no element of judgment or choice." *Elder*, 312 F.3d at 1177. The Phase I Contract designated the Base Civil Engineer as the representative of the Contracting Officer for the purpose of technical surveillance of workmanship and inspection of materials for work under the contract. (Gov. Ex. 2.) However, the Contract did not provide a specific course of conduct for surveillance or inspection. The Phase I Contract is not helpful to the Garcia's because it did not prescribe a specific course of action for the Government.

The Garcia's reliance on the Specifications is similarly unavailing. According to the Garcias, the Specifications required a United States Air Force employee to "[v]erify roof openings are framed, sized and located prior to installing work for this Section" and that the installation must be "weather tight." (Pl. Ex. C.) The Garcias further assert that the Specifications required an Air Force employee to inspect for moisture protection and "not proceed with installation until satisfactory conditions have

9

been met." *Id.* However, review of the Specifications establishes that the cited portions apply to the installer, i.e., Northeast, and not to an Air Force employee. *Id.* The Specifications do not satisfy the first prong of *Berkovitz* because they do not prescribe a specific course of action for any government employee.

The Garcias contend that the Settlement Agreement establishes that Northeast was the "completion contractor" for the Phase I Contract. (Pl. Ex. B.) Although the Stipulation of Settlement and Agreement does not so state, other evidence in the record indicates that another contractor completed part of the project. In an affidavit attached to the Garcias' reply brief, T.J. Hiehle, former President of Northeast, stated that the renovation project was originally contracted to another entity that defaulted and that the Government contracted with Northeast to complete the renovation project. (Pl. Ex. 1.) Documents submitted by Northeast in support of its motion for summary judgment indicate that substantial portions of Unit 2553A, including the roof sheathing, felt, shingles, and flashing were complete by May 1992, and that Northeast took over the project in 1993. (Northeast Exs. B and C.)

According to Mr. Hiehle, the Government provided an inspector and project manager to oversee construction and insure that Northeast followed the Specifications. (Pl. Ex. 1.) Disputes arose between Northeast and the Government regarding increased costs associated with Phase I. (*Id.*) Northeast and the Government ultimately entered into the Settlement Agreement to resolve the disputes. (*Id.*) The Government agreed to perform all remaining work on Phase I at Government expense and agreed that it would not hold Northeast responsible for any warranty work in any housing unit not accepted by the Government by the close of business on December 15, 1995. (*Id.*) Mr. Hiehle does not know whether Unit 2553A was accepted by the Government by the close of

10

business on December 15, 1995. (*Id*.) The affidavit is silent as to duties of the government inspector and project manager and whether Unit 2553A was complete on December 15, 1995.

The Garcias claim that the Government agreed, as part of the settlement, to warrant the property at issue. (Pl. Ex. B.) The Settlement Agreement does not so state. Instead, the Settlement Agreement provided that the Government would perform all remaining work on all remaining housing units at the Government's expense and that Northeast would not be held responsible for any warranty work in any housing unit not accepted by the Government by December 15, 1995.

The record indicates that the roof was complete by May 1992, and insulation was installed in October 1995. The Settlement Agreement does not contain any specific provisions as to the installation of insulation, roofing, or flashing. The Settlement Agreement does not satisfy the first prong of *Berkovitz* because nothing in the Settlement Agreement prescribed a specific course of action for the Government.

The Phase I Contract, Specifications, and Settlement Agreement do not specify a course of conduct for the Government. The Government's relinquishment of control in this case stands in stark contrast to the high level of control the government retained in *Bell v. United States*, 127 F.3d 1226 (10th Cir. 1997) and the direct relationship between the ignored directive and the resultant harm.

In *Bell*, the government agreed to supervise compliance with safety specifications governing the expansion of a reservoir used for recreational purposes. *Bell*, 127 F.3d at 1229. The contract in *Bell* incorporated specific safety standards that imposed duties on the government's project construction engineer. *Bell*, 127 F.3d at 1227-29. The project involved excavation of an area that contained a water pipeline. *Id*. "The specifications presumed that the pipeline would have to be removed, at least temporarily, to facilitate excavation. In the event the pipeline were to be replaced

in its original location, the specifications required it to be buried in a trench." *Id.*, 127 F.3d at 1230.

In violation of these specific proscriptions, the government's project construction engineer allowed the contractor to leave the pipeline in place and to excavate around the pipeline. *Bell*, 127 F.3d at 1228. "As a result, excavation on both sides of the pipeline created a bench approximately fifteen to twenty feet wide and rising some four to eight above the bottom . . ." *Id*. The "bench was eventually submerged, the top of the bench lying just fifteen to thirty inches below the surface of the reservoir." *Id*.

The recreational uses of the reservoir were known to the government's project construction engineer, yet the reservoir was "manifestly left in a condition that would (and demonstrably did) impair the recreational usefulness of the reservoir." *Id*. Fourteen-year-old Joseph Bell was rendered quadriplegic when he dove into the lake and struck the raised bench. *Bell*, 127 F.3d at 1226; 1230. The Tenth Circuit held that the discretionary function exception was inapplicable "[b]ecause the specifications, read as a whole, prohibited [the construction project engineer] from leaving the raised bench" in the reservoir. *Bell*, 127 F.3d at 1230.

By contrast, in the instant case, the Government did not assume a contractual obligation that imposed specific duties on the Government. The only relevant duties the Government assumed were to provide an inspector and project manager with unspecified duties, to perform all remaining work on all remaining housing units at the government's expense, and that Northeast would not be held responsible for any warranty work in any housing unit not accepted by the Government by December 15, 1995. The record indicates that Unit 2553A was complete before December 15, 1995. Nothing in the record indicates that the Government performed any work on, or assumed any duty with respect to, Unit 2553. Unlike the situation in *Bell*, the contract and the specifications in the instant

12

case, read as a whole, did not impose any specific obligations on the government.

In addition to *Bell*, the Garcias rely on *Ayala v. Joy Mfg. Co.*, 877 F.2d 846 (10th Cir. 1989); and *Camozzi v. Roland/Miller & Hope Consulting Group*, 866 F.2d 287 (9th Cir. 1989) in support of their contention that the documents curtail the exercise of discretion. These cases are not on point. In *Ayala* and *Camozzi*, the government agency retained responsibility for safety precautions and compliance with mandatory safety standards. *Ayala*, 877 F.2d at 847; *Camozzi*, 866 F.2d at 290. Here, the Government did not retain responsibility for safety precautions. As more fully discussed in the MOO, no mandatory safety standards were imposed on the Government with respect to the renovation of 2553A.

The documents submitted by the Garcias do not prescribe a course of action for the Government. The Government did not retain responsibility for safety precautions or compliance with mandatory standards. Because nothing prescribed a specific course of action for the Government to follow with respect to renovating Unit 2553A, the challenged conduct is discretionary under the first prong of the *Berkovitz* test. *Elder*, 312 F.3d at 1180.

Having concluded that decisions regarding the renovation of Unit 2553A involved discretionary judgment, the analysis turns to the second prong of the *Berkovitz* test and considers whether that judgment is of the kind that the discretionary function exception was designed to shield. If an "established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). The pertinent inquiry is whether the decision "implicates the exercise of a policy judgment of a social, economic, or political nature." *Elder*, 312 F.3d at 1181.

Decisions that turn on the availability and allocation of government resources are classic examples of the types of decisions that the discretionary function exception was designed to shield. *Harrell v. United States*, 443 F.3d 1231, 1236 (10th Cir. 2006) (holding decision by Coast Guard concerning maintenance of buoy was based on social, economic, or political policy); *Kiehn v. United States*, 984 F.2d 1100, 1107 (10th Cir. 1993) (holding that a decision by National Park Service based in part on the agency's limited personnel and resources was a judgment based on social, economic, or political policy). It is well-established that a government decision to delegate responsibility for safety to an independent contractor falls within this category. *Domme v. United States,* 61 F.3d 787, 791 (10th Cir. 1995); *Varig Airlines,* 467 U.S. at 820.

Courts have held that decisions concerning military housing renovation fall within, and are protected by, the discretionary function exception. *See Duff v. United States*, 999 F.2d 1280, 1281 (8th Cir. 1993); *Laurence v. Department of Navy*, 59 F.3d 112, 113 (9th Cir. 1995). The Government submitted evidence that Air Force base civil engineering organizations do not have adequate resources, such as manpower and funding, for full implementation of inspections and safety precautions.  Def., Ex. 28.)  Because decisions concerning the renovation of military housing necessarily take into account questions of how to allocate limited resources among competing needs, such decisions implicate the exercise of a policy judgment of a social, economic, or political nature.

In sum, "[n]othing in the record rebuts the presumption that under circumstances such as this, the government's actions and decisions were grounded in policy." *Domme*, 61 F.3d at 793 (citing *Gaubert*, 499 U.S. at 324-25).  The claims against the United States are barred by the discretionary function exception to the FTCA.

**WHEREFORE,**

**IT IS ORDERED** that the Government's Motion to Dismiss Plaintiffs' Rule 60 (b) Motion (Doc. 105), filed on November 15, 2005, is granted nunc pro tunc to January 4, 2006 with respect to the request for extension of time to file response brief and otherwise **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff Dennis Garcia and Inez Garcia's Motion for Relief from Judgment or Order (Doc.100), filed on October 31, 2005, is **DENIED.**

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**